## BANK OF SPEARFISH v. GRAHAM.

1. Where orders shown to a prospective purchaser by an agent were proved to have been fictitious, and all representations concerning their procurement apparently untrue, the question whether such deception was resorted to to defraud him should have been left to the jury.

2. Where a purchaser was justified in believing that forged orders shown him were genuine, and that fraudulent representations as to purchases

16 S. D.—4

were true, the question whether he was induced by such forged orders and fraudulent representations to execute notes should have been left to the jury, as, under Comp. Laws, § 3509, "actual fraud is always a question of fact."

3. It was for the jury to determine whether the statements were mere expressions of opinion, or averments of material facts.

4. A subsequent holder suing on notes claimed to have been procured by fraud could not object that the maker had not returned the property for which they were given.

5. Where the jury might have found, under proper instructions, evidence of fraud sufficient to cast on an indorsee the burden of showing that the notes were obtained in good faith for value, it was error to direct a verdict for him.

(Opinion filed July 2, 1902)

Appeal from circuit court, Lawrence county. Hon. JOSEPH B. MOORE, Judge.

Action by the bank of Spearfish against W. H. Graham to recover upon certain promissory notes; judgment for plaintiff, and from an order overruling a motion for a new trial defendant appeals. Reversed.

*Frawley & Laffy* and *Moody, Kellar & Moody*, for appellant. *Martin & Mason*, for respondent.

FULLER, J. Plaintiff having recovered in this action on two promissory notes given as part consideration for 100 patent telescope flour receivers, and the exclusive right to sell such device in certain territory, the defendant, who made the notes, appeals from an order overruling his motion for a new trial.

Although appellant sought to show that the notes are without consideration, and fraudulently obtained by the patentee and two of his agents, from whom respondent purchased

the same, the trial court withdrew all the facts from the con-
sideration of the jury and directed a verdict for the full amount
claimed.   It was clearly shown by the evidence that during the
negotiations with appellant, and prior to the consummation of
the sale, these agents (Camp and Cross) represented, among
other things, that the flour receiver was a most valuable inven-
tion, and one that could be sold by persons without the least
experience to almost every one at a great profit; that they had
sold in the vicinity of appellant's place of residence more than
100; and, to verify the assertion that the receiver was some-
thing that sold itself, they exhibited a large number of written
orders or contracts of sale entered into with the various pur-
chasers, and stated that it required no experience whatever to
do the bnsiness.   A sample machine used by the agents in can-
vassing (being one vastly superior to those afterwards deliver-
ed to their customers) was exhibited to appellant at the time
he was induced to enter into the contract and execute the notes
in suit.   The following testimony of appellant is fully cor-
roborated: "Mr. Cross first approached me, and says that
they had an article that was a very good-selling article, and
one that they had sold to almost every one in the country; that
it was a very easy seller—one that a person without any ex-
perience could sell; in fact, it sold itself, and he wanted to
know if I would take hold of anything of that kind.   He said
that it was a very useful article and that its usefulness recom-
mended itself to every one who saw it; that that fact made it a
ready seller.   At that time he exhibited to me the name of John
Wolzmuth upon an order; also the name of Mrs. Robert Evans.
John Wolzmuth is the mayor of Spearfish, the manager of the
Spearfish Milling Company, and is in the hardware business in

Spearfish. At that time Cross represented that John Wolzmuth had bought a flour receiver, and exhibited to me Wolzmuth's written order for one. He also represented that Mrs. Robert Evans had bought one. He presented a list of these names, represented to be orders taken from individuals up and down the valley and he said, 'Now, we will start in right here at town' (these were his words, as near as I remember); and he says, 'There is—'(repeating the names as they came, went on down the valley), He says: 'We haven't missed a one. We have got orders of every one down the valley, as you can see.' And in running over the list of names, the name of Mr. Wolzmuth—I remember it from the fact that he was a hardware dealer there in town, and I regarded his name as good. * * * I told him I had never had any experience in canvassing at all, and he said that it did not require any; that he had· sold them very readily; and exhibited the orders to demonstrate the fact. And he said that there hadn't been any time that he had gotten into his buggy and worked there in Spearfish that he hadn't made over $10 a day, that he had no experience as to any canvassing, that the flour receiver sold at sight, and that all that was necessary was to show it, and that every one was willing to give him an order without any persuasion on his part. * * * At the time he was attempting to induce me to execute these notes, he also represented that I could make from $10 to $20 per day in the country in which I was assigned territory. He said that the flour receiver, being dust-proof, was a great advantage; that the mechanical part of it was a great flour receiver device. He said that he himself was going into Nebraska to work. * * * I met Mr. W. H. Curtis, who claimed to be he p atentee of this device, in my place of business at Spear-

fish.   That was before I gave my notes.   Mr. Cross brought him in, and made him explain more fully in regard to the flour receivers.   He said that he was the patentee of the flour receiver, and that Mr. Cross was his duly appointed agent.   He told me the trouble he had had, and the work he had been to, in getting the cost of the receiver reduced to a price at which he could sell it with a good compensation.   He went over the facts that Mr. Cross had given to me, as near as I can remember, and spoke of it as an article that I could take hold of and do very much better than I could in my business there at Spearfish, as I would have no competition in the line of flour receivers, as they were secured fully by patents, and would admit of no infringement of territory.   * * *   Yes; I believed Mr. Cross when he represented to me that Mr. Wolzmuth had given him a written order for one of these telescope flour receivers.   I believed him when he represented to me that Mrs. Evans had given him a written order, and when he exhibited her written order to me.   I believed the representations he made with reference to the sale of these receivers.   I did not have any experience or knowledge with reference to the device they were attempting to sell me prior to that time.   Yes, sir; I believed the various representations to be true that I testified concerning. with reference to the merit, adaptability and selling character of this receiver.   Yes, sir; I believed all the representations that he made to me with respect to the transaction that he was attempting to enlist me in.   * * *   When the Wolzmuth order was being discussed by Mr. Cross, he made the remark:   'When a man of that kind gives an order, there must be something in it.'   * *   I had no idea that Camp and Cross were attempting to negotiate my notes to the

bank, or had any such intention of so doing.   They told us that
the notes would not pass from their possession, that they would
keep the notes there, and that, any time we were dissatisfied—
that they wanted us to feel secure in the matter, and that, at
any time we were not satisfied, that they were willing to turn
the notes over to us.   These representations that they would
keep my notes were made before I executed them, as well as
afterwards.   Upon my return from Chicago, about the first of
September, it was generally rumored in Spearfish and vicinity
that this receiver business was a shady transaction." Mr.
Robert E. Russell, whom these agents induced to become in-
terested with appellant in the receiver and territory, after fully
corroborating the foregoing testimony as to the methods em-
ployed to secure the notes in suit, testified in part as follows:
"Curtis told us that he was worth considerable money, and
had 1,000 acres of blue grass land in Kentucky, and that he had
made his money in this business, and we could do the same.
He said that we could make more in six months selling teles·
cope flour receivers than we could make in two years in the
furniture business.   Mr. Curtis told us at that time that he had
two patents on this device—a design and also a mechanical
patent.   He told us how much trouble and expense he had been
to in procuring these patents; that he had made two trips to
Washington for that purpose, and that he was protected for a·
term of fifteen years; that there would be no opposition of any
kind, and that it required no capital—not a dollar—to go into
it; that there would be no money to be paid until we had taken
orders, delivered goods, and made our collections, and that it
did not require a salesman; that it sold itself everywhere. . Mr.
Cross said that the machine was very durable, and would last

a lifetime; that it was his experience that it was very practical and was greatly sought after. Mr. Cross said it required no experience whatever to sell; that he would rather send a boy to sell it then a man that had experience in canvassing, for the thing sold itself—sold at sight—and that all it required was some one to be able to set it up, people were so anxious to buy it. He also said there was no article like it on the market, and that there would be no opposition of any kind. Mr. Cross said that he had made not less then ten, and from that to forty, dollars per day. The Mr. Cross that I speak of is the same Mr. Cross spoken of by Mr. Graham in his testimony. Mr. Cross also exhibited to me certain purported orders for the receiver. I saw a great many names. Q. Did you see Mr. John Wolzmuth's name? A Yes; Mr. Cross exhibited this order. Said he had sold a receiver to Mr. John Wolzmuth. Yes, sir. I saw at that time an order of Mrs. Edward Cachelin. Q. Did he say anything to you as to selling Mrs. Cachelin one of those telescope flour receivers? A. Yes, sir. Q. The same lady that was on the stand to-day? A. The same lady; yes, sir. Q. State at that time if he told you anything about selling a flour receiver to Mrs. Evans. A. Yes, sir.''

As the orders containing the purported signatures of Mrs. Evans, Mrs. Cachelin, and Mr. Wolzmuth were shown to be fictitious, and all representations concerning their procurement apparently untrue, the irresistible inference is that such deception was resorted to for the purpose of defrauding appellant, and the testimony relating thereto, together with all the other evidence introduced at the trial, should have been submitted to the jury. Appellant being fully justified in believing these forged orders to be genuine, and that his neighbors

had made purchases as represented, it was for the jury to find whether he was defrauded by such material averments afterwards shown to be false. "Actual fraud is always a question of fact." Compiled Laws, § 3509. Upon learning that appellant possessed no knowledge of the patent-right business, and knew nothing of the demand for, or the intrinsic qualities of, the flour receiver, the patentee and his agents appear to have resorted to systematic deception for the purpose of negotiating a sale. In any event, it was necessary, as the case stood, for a jury to determine whether the statements operating as an inducement to the execution of the notes in suit were the idle expressions of a boaster's opinion, or the averment of material facts. Allen v. Hart, 72 Ill. 104; Moon v. McKinstry, 107 Mich. 668, 65 N. W. 546; Stubbs v. Johnson, 127 Mass. 219; Cole v. Carter, (Tex. Civ. App.) 54 S. W. 914; Foster v. Kennedy's Adm'r, 81 Am. Dec. 56; Nowlin v. Snow, 40 Mich. 699; Warner v. Benjamin, 89 Wis. 290, 62 N. W. 179. In several of the foregoing decisions, as well as in the case of Strickland v. Graybill (Va.) 34 S. E. 475, statements similar to those disclosed by this record, and made to promote the sale of a patent right, were held, as a matter of law, to be averments of material facts, and not mere expressions of opinion. Appellant, being wholly unacquainted with the value, utility and salability of the invention. did not stand on equal footing with the patentee and his agents, and their representations with reference thereto were the only information available. As the undisputed evidence shows that he believed what these vendors said, and, at their solicitation, negotiated for 100 flour receivers, and the right to sell the same in certain territory, it is quite probable that his reliance upon the truthfulness of

their representations was productive of the injury sustained. The patentee and his agents being experts and familiar with all the points to which their conversation with appellant re-lated, their misrepresentations as to orders taken, and their exaggerated statements as to the quality and value of the invention and the demand for it, cannot be excused as harmless expressions of opinion; and it was for the jury to say whether appellant, who had the right to rely upon such representations, was thereby defrauded. Hicks v. Stevens, (Ill.) 11 N. E. 241.

The respondent bank being neither a party to, nor interested in, the contract for the flour receivers, and dealer's appointment for the sale thereof, there is nothing in the contention that appellant must restore what he received, in order to be entitled to show that the notes in suit were fraudulently procured. Moreover, none of the receivers for which the notes were given were ever delivered to appellant, and the so-called dealer's appointment had become void according to its terms.

Were this action between the original parties, and for the purpose of rescinding the contract, it is exceedingly doubtful if there would be anything of value to restore. As respondent is not claiming to be connected with the original contract between appellant and the vendors of the patent right, but an innocent purchaser of the notes made the basis of this action, appellant must prove that such notes were procured by fraud, in order to overcome the presumptions adhering to negotiable paper.

In directing the verdict the trial court appears to have taken it for granted that respondent was an innocent purchaser, but the jury might have found, under proper instruc-

tions, evidence of fraud sufficient to cast upon such endorsee the burden of showing affirmatively that for value the notes were obtained in good faith before maturity, and without notice of any legal objection thereto. Landauer v. Improvement Co., 10 S. D. 205, 72 N. W. 467; Jamison v. McFarland, 10 S. D. 574, 74 N. W. 1033; Dunn v. Bank, 11 S. D. 305, 77 N. W. 111.

As the case stood, the testimony was reasonably susceptible of an inference at variance with the view taken by the trial court, and, under proper instructions, it ought to have been submitted to the jury.

The order appealed from is reversed, and a new trial granted.